# UNITED STATES DISTRICT COURT

for the
District of Colorado

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person* )   Case No. 20-sw-996-GPG
*by name and address*) )
)
INFORMATION ASSOCIATED WITH )
FACEBOOK USER ID 1300968540 THAT IS )
STORED AT PREMISES CONTROLLED BY )
FACEBOOK INC. )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___Northern___ District of ___California and elsewhere___ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

 X evidence of a crime;

 X contraband, fruits of crime, or other items illegally possessed;

 X property designed for use, intended for use, or used in committing a crime;

 ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 18 U.S.C. § 875, and the application is based on these facts:

 X Continued on the attached affidavit, which is incorporated by reference.

 ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ John Busch*
_____
*Applicant's signature*

John Busch, SA
_____
*Printed name and title*

Sworn to before me and:  ☐ signed in my presence.
         ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:  __8/28/2020__

_____
*Judge's signature*

City and state:  __Grand Junction, CO__     Gordon P. Gallagher, USMJ
                 *Printed name and title*

## AFFIDAVIT

I, John Busch, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been since 2015. Prior to my current position, I was a patrol officer and investigator during my five-and-a-half-year career in local law enforcement.  I am currently assigned to investigate a wide variety of federal criminal violations to include interstate threatening communications, violent crimes, white-collar crimes, controlled substance crimes, terrorism, public corruption, computer crimes, fraud against the government, child pornography, and other violations.

2. As part of my duties, I investigate criminal violations occurring in the Western Slope of Colorado.  I am the case agent on this case.  As such, I am fully familiar with the facts of the case.

3. As part of my training and experience, I have participated in investigations involving electronic evidence, emails, text messages, and the Internet.

4. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

1

2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

5. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 875 (the "Subject Offense(s)") are present at the location described.

6. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the Subject Offense(s) have been committed by Darrell Holman.  There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## BACKGROUND ON FACEBOOK

8. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

ver. 4/20 w/o Prospective Location Information

9.  Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

10. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

11. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

12. Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

13. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

14. Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.

ver. 4/20 w/o Prospective Location Information

Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

15. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

16. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

17. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

18. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

19. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

20. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized

5

message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

21. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

22. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

23. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.  Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

24. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event

postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

25. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

26. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

27. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data

retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

28. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their

use of Facebook, such as account access information, transaction information, and other account information.

## **PROBABLE CAUSE**

29. In November of 2019, Montrose Police Department (MPD) officers responded to the Hanging Tree RV Park, 17250 Highway 550, Montrose, CO, for a report of Darrell Holman, AKA "Petey", making suicidal comments. Holman is a 43 year old black male with a date of birth of X/XX/1977. Holman does not have a criminal history outside of traffic violations. Upon arrival, officers spoke with Holman who denied being suicidal and did declined to speak with officers at any depth.

30. On June 21 of 2020, Holman's wife, Resetta Holman, committed suicide by means of a firearm in the motorhome that they lived in at the Hanging Tree RV Park. The motorhome is a 1978 Vogue motorhome, model FTH, Colorado license plate 788VQF, VIN: M60DA8T501088, with a registered owner of Margaret Hendrix. During the death investigation, MPD Detectives discovered ammunition and nine firearms in the motorhome. The firearms had the following serial numbers and descriptions:

> SER/HB015583 – H&K 416D
>
> SER/R105831 – Derya Arms, NV
>
> SER/192059F – No markings, shotgun
>
> SER/F20505 – Hi Point 1095
>
> SER/LGQ46 – Tek-Tec .380 pistol (used in suicide)
>
> SER/Q5773 – Kel-Tec K87
>
> SER/FFLZ05 – Kel-Tec Sub 2000
>
> SER/49305091 - Ruger 22 LR

ver. 4/20 w/o Prospective Location Information

SER/MN41853B – Unknown – not documented

31. In addition to the firearms, Holman had a large amount of ammunition and a drum style magazine that had a large capacity for ammunition.

32. There was clear evidence that Resetta's death was a suicide. Holman was never a suspect.

33. On the day of the suicide during an interaction with MPD officers, Holman was extremely uncooperative and attempted to reach into his vehicle – either a 2000 Subaru Outback or a 2012 Toyota Camry. When officers told him he could not he became more upset. Officers later learned that the vehicle Holman was attempting to get into had multiple firearms inside.

34. On June 23, 2020, Crystal Richardson contacted the Montrose Police Department to report that Holman was suicidal and had an extreme distrust and hate for law enforcement. Richardson described herself and her husband as best friends with Holman and that Holman had stayed with them the night prior. Richardson reported was not in a good mental state and that any contact with Holman could turn into a deadly situation for both sides.

35. On June 30, 2020, Karl Watson, a friend of Holman reported to the MPD that Holman was fired from his job at a marijuana dispensary in Telluride, CO and soon after sent Watson concerning texts. Watson reported that Holman was texting homicidal and suicidal things to him and that some of the messages lead Watson to believe that he would harm his former boss and that he had already harmed or killed someone.

36. On July 15, 2020, Kabrianna Stephenson contacted the MPD to report harassment via social media by Holman – Stephenson's stepfather. Stephenson also reported that Holman was making specific threats towards her younger brother (Holman's son), Deunta Coleman. The threats and harassment were mainly over social media, specifically a picture sharing application named Instagram. For reference, Instagram is a social media platform specifically

used for picture/video sharing where a user's account can be open to public view or marked private. When an account is private, a "follow request" can be completed in order to see the specific profile. The user has to accept the request in order for this to happen. Instagram also has picture caption, comment, and messaging

capabilities. Stephenson reported that Holman went by the name of "peteiegreen" on Instagram and his profile was open to public view. Of note, "Peteie Green" is also the name that Holman uses via Facebook. Using the Instagram application, an MPD officer looked up the name "peteiegreen" and was able to locate a very active profile, open to public view, which clearly showed pictures and videos of Holman's face. The officer recognized the male in the pictures and videos as Holman from previous law enforcement contact with him on 06/21/2020.

37. MPD and the FBI reviewed Holman's Instagram videos and pictures. A video was posted on July 13, 2020 with a location of the Ute Indian Museum – the museum is located across the highway from where Holman's motorhome was parked. The video shows what appears to be a small vial of ashes hanging from the rearview mirror in a vehicle. Holman says something along the lines of, "I ride with her everywhere I go." Holman then turns the camera around to face him and begins speaking. Holman says, "Tay (nickname for Deunta Coleman) if I ever fucking see yo ass imma light yo ass the fuck up. On my daddy fucking soul. On my wife grave. I'm not playin these games wit y'all hoe ass niggas, who is part time kids. Part time family members. Talkin all this shit. Y'all mother fuckers wasn't here when she was spazin. Y'all mother fuckers didn't know what she was going through. So yeah, we had an argument. Cool but she was fucked up way before that. Y'all don't even know what happened that whole fuckin weekend because you only snapchatted her, talked to her when

you had y'all fuckin problems. The niggas who swung at her, disrespected her, called out her name, ran from the house and all this shit, wanna act like 'Oh my God I love her so much!'. That's because your punk ass... Man I should've left you in a home cuz. Your ribs so broke nobody wanted your dumb ass because they thought you was retarded. So fuck you, nigga. Imma end that fucked up life for you. If you got a problem come see me. Ain't no passes given. I've got a perfect bullet just for your ass, man." He then holds up a box of hollow-point ammunition and says, "These mutha fuckas is like $40.00 a piece. Fuck yo bitch as up quit playin wit me". The box has a clear top, which shows the tops of the rounds. The caption with this video stated the following: "This goes out to any mf talk shit or want smoke fuck your feeling and if drama betta bring your best cause I dint think you have any idea .. @deunta17 so if you ever want not to be the bitch Ass neglects wish some love look ass boy you are come see bitch".  Upon clicking on the "@deunta17", it led to another profile on Instagram, which belonged to Deunta Coleman.

38. A video posted on July 14, 2020 begins with it pointed towards a television. A male begins speaking and the camera is then turned around. Holman was then in the view of the camera and he stated the following: "Hey man, been up cleanin and shit. Re-arrangin some stuff. Trippin mother fuckers talkin shit. Man, Tay Tay Tay, come on now. You can't call me broke when my gun collection costs more than everything you own. See imma fuck wit you now." Holman is difficult to understand in the remainder of the video, however, it is clear that he begins speaking about Coleman's girlfriend, who was later identified as Rhyan Cockroft.  The caption along with this video stated the following: "Hey gm @deunta17 you take the bag off her head *crying laughing emoji* man you a beast to for claiming that even og cut her out the picture y'all took because she was so disgusting.. she use it as her

screen saver don't believe me as bunny *crying laughing emojis*" He also tagged Coleman's Instagram account in the video itself.

39. Coleman and Holman comment back and forth on this specific post for an extended time. Coleman defends his girlfriend but does not make any threats. Holman continues antagonizing Coleman by commenting repeatedly, even after Coleman does not reply.

40. Multiple videos were posted to Holman's Instagram on July 14, 2020 that were directed towards Coleman. In these videos, Holman insults Coleman and his girlfriend Rhyan Cockroft.

41. A video posted to Holman's Instagram account on July 15, 2020 was of Holman speaking to the camera. At one point on the video, Holman addresses Coleman directly and says, "Imma piss in your mouth if I ever see you nigga. After I shoot yo ass. Ya bitch. And I'm tagging you in this shit". He then refers to his girlfriend as an "ugly ass cock sucking cum bucket".

42. An additional video was posted on July 15, 2020, with the caption of, "Enough said pick your bullet  ..." Coleman was tagged in the video itself but not the caption. Holman is again laying down in the video and begins by explaining what he is doing/has done in the day so far. He also stated the following: "No love lost for nobody that ain't got love for me. Fuck you. And to all them people, like Deunta and anybody else talking shit, pick your bullet. 10mm? 9mm? .380? Shottie? And then pick which one you want. The expensive ones or the cheap ones cause imma put one in your head. Starting with your boy." He then sits up and says, "If you don't pick Tay, I think this the one imma use on ya" and holds a bullet in view of the camera. He continues, "This mutha fucka right here, bitch. It's a 10 mil right between yo mutha fuckin eyes. Imma fix your problems. You and that ugly ass cow of yours.

Holla at yo boy". Coleman and Holman commented back and forth on this post. The conversation was as follows:

Coleman: "9mm"

Holman: "great my favorite... I'm use the good one too them RIPs your bitch get one too nigga"

Coleman: "great"

Holman: "thank you jedus thanks how your family say it you won't have a open casket cause after I empty the 30 I'm use the shotgun"

Holman: "And the best part you can or ain't gone do shit about it so enjoy your last days bitch @deunta17"

Holman: "I figure you would but I'm make you watch her die slowly and horrible before I put the bullet in you .. she still gone be breathing until I get tried of playing with her peeling her skin type shit"

Holman: "Make a coat out that shit and show shoes from you .. call it bum fit"

Holman: "Like I said you can stop it or do shit to prevent it .. so just wait to die or nut up and make it faster bring who ever you want they can go with .. I don't think you understand the point to where I'm at mentally.. but you gone find out"

43. On July 15, 2020, Holman posted a video of a firearm, with the following caption: "Bitch boy prefect your Heffer suuuuuue weee is what you y'all when you want her huh @deunta17 but this next one is East gone make it Impossible to be seen hell have any parts left". This video began with Holman speaking and videoing the gun at the same time. He said, "This right there boy, that's the 10 millimeter. ... Fucker you want the 9. Fuck that. That nigga don't get the 9, he get the 10. You live with a moose I gotta take em down. A 10 will

knock a big animal down. Can't wait to use my scalpel on that bitch ass nigga. Ooooooo. That's only one of them too." The firearm in the video is the same firearm from previous Instagram posts that Holman has made posing with the gun in a military style gas mask. Coleman commented on this video and said, "Just leave us alone my guy". Holman replied, "@deunta17 not til your dead *skull emoji* I don't think I will". Holman commented again, "@deunta17 you reported me dude you a pure bitch seriously man dam you a bitch".

44. Holman then posted an additional video within the same period. This video was of two black long guns. One of the guns had a large drum magazine attached to it. The caption stated: "I'm use this one @deunta17". Holman said the following in this video: "Call that big ass fat bitch. I'll drop yo ass. Oh yeah. That here, that's a barrel. That's a drum." He then focuses on the drum magazine for a short time. He continues by saying, "Mmmm. No open casket for yo ass. I don't come with no handgun. I come with a 30 nigga!" He then moved the camera to the gun laying above. He said, "I got a 30 for that one too. These aren't even the best pieces in the collection nigga. Yo ass is mine".

45. All of the videos were recorded and saved by MPD and FBI. A preservation request was made to Facebook/Instagram.

46. Holman has posted at least 27 times on Instagram since the first video threatening Coleman posted on July 13, 2020. The majority of the posts referenced Coleman and Cockroft, threatening and harassing them both.

47. An MPD Officer spoke with Coleman via phone and asked him to explain what was going on. The call was recorded. Coleman said that he was very concerned about Holman's current mental status. He said that Holman is his father and Holman's late wife, Resetta, was

his stepmother. Coleman said that growing up, Holman was very abusive to him and his siblings. On one occasion, Holman choked him out until he was unconscious. Coleman said that the argument between him and his father (Holman) began when Holman posted about Resetta on Instagram. Coleman made the comment of, 'You shouldn't be posting about her". The MPD Officer read this comment upon reviewing the Instagram exchanges between the Holman and Coleman and did not observe Coleman to have said anything harassing in nature on that particular post. Coleman said it all had escalated since then and he is becoming very concerned. When asked how the threats on Instagram made him feel, he said that he believed Holman could/would travel to Wisconsin, where he and Cockroft live, in order to kill them.

48. Coleman believed that Holman would harm him. When asked how Cockroft felt about the comments, Coleman said that she was very upset about them as well.

49. Holman has two vehicles, which are both registered to him. One of the vehicles is a green Subaru Outback bearing Colorado license plate: BDNC42. He also has a black Toyota Camry bearing Wisconsin license plate: 832VFX. Holman knows where Coleman resides and specifically references that in one of the Instagram videos. Holman makes several comments about having a "collection of guns" and a large amount of ammunition. This is a concern due to Holman's severe dislike and distrust of law enforcement, his threats to others, and his mental state. As referenced above, Holman's close friends believe that he is heavily armed most of the time, if not all of the time. He was recently fired from his job, adding to his frustrations. He told a friend, KARL WATSON, that he "had nothing to live for" so he "found something to die for".

50. When MPD Detective Graves interviewed Holman in regards to the suicide of his wife, he stated that he has purchased the weapons and supplies since the recent death of George Floyd, which sparked racial tensions and hostility toward law enforcement. Holman has posted various pictures and videos of the large capacity magazines, which are clearly capable of holding more than 15 rounds.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

51. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## REQUEST FOR NON-DISCLOSURE

52. Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), I request the Court order Facebook not to notify any other person of the existence of this warrant for the period of one year.  This request is made because notification of the existence of the warrant will result in endangering the life or physical safety of an individual, flight from prosecution, destruction of or tampering with evidence, and intimidation of potential witnesses.

53. For the same reasons, I respectfully request that this affidavit and the Court's Order be RESTRICTED at level 3 until further order of this Court.

# CONCLUSION

54. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

55. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

56. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offense(s) may be located within the Facebook account described in Attachment A.

57. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

ver. 4/20 w/o Prospective Location Information

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.


*s/ John Busch*
John Busch, Special Agent
Federal Bureau of Investigation

Subscribed, attested to, and acknowledged by reliable electronic means on August ___28___, 2020.

_____
The Honorable Judge Gordon Gallagher
United States Magistrate Judge


Application for search warrant was reviewed and is submitted by Pete Hautzinger, Assistant United States Attorney.

19

## <u>ATTACHMENT A</u>

**Property to be Searched**

This warrant applies to information associated with the Facebook user ID 1300968540 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

ver. 4/20 w/o Prospective Location Information

## <u>ATTACHMENT B</u>

### Particular Things to be Seized

I.    <u>**Information to be disclosed by Facebook**</u>

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A for the time period of **6/14/2020 to 8/27/2020**.

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, links, and other items; Notes; Wall postings; friend lists,

ver. 2/20

including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

ver. 2/20

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 875 involving Darrell Holman since June 14, 2020, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)  A threat to kill Deunta Coleman and Rhyan Cockroft

(b)  Evidence indicating how, when, and where the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

ver. 2/20

(c)  Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d)  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e)  Historical location information relevant to the crime under investigation and that helps identify the user of the account or events relating to the crime to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner and the owner's contacts;

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### III.   <u>Order Of Non-Disclosure</u>

Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), the Court orders Facebook not to disclose the existence of this search warrant to any person for the period of one year, including the subscriber, other than its personnel essential for compliance with the execution of this warrant.

ver. 2/20